SO ORDERED.

SIGNED this 31st day of December, 2015.

_____
BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

In re:                                )
                                      )
Gail Newson Highsmith,                )          Case No. 12-80586
                                      )
        Debtor.                       )
                                      )
_____)

MEMORANDUM OPINION DENYING LEAVE TO FILE AN UNTIMELY RESPONSE,
FINDING WILLFUL VIOLATION OF THE AUTOMATIC STAY, AND SETTING A
FURTHER HEARING TO QUANTIFY DAMAGES

This matter came before the Court on Debtor's Motion for Sanctions against Harnett

County Social Services ("Harnett County") and/or North Carolina Department of Health and

Human Services (DHHS) for Violation of the Automatic Stay [Doc. # 53] (the "Motion for

Sanctions") on October 22, 2015 (the "Hearing").  The Motion for Sanctions was filed on

September 17, 2015, and Harnett County filed a Response on October 15, 2015 [Doc. # 62]

("Harnett County Response").  At the Hearing on October 22, A.B. Harrington, III, appeared on

behalf of the Debtor, Richard Sparkman appeared on behalf of Harnett County, and Richard M.

Huston, II, appeared as Trustee.  The Court received testimony from the Debtor, Gail Newson

Highsmith, and Daphne Tyler, Program Administrator for Harnett County.

The North Carolina Department of Health and Human Services ("DHHS") concedes that

it was properly and timely served with the Motion for Sanctions.  [Doc. #69 ("Motion for Leave

1

to Respond"), ¶ 6; Affidavit of Rose Thompson ("Thompson Affidavit"), ¶¶ 3 and 4]. Nevertheless, DHHS did not respond to the Motion for Sanctions prior to the hearing, and did not appear at the hearing. Over a week after the Hearing, on October 30, 2015, DHHS belatedly[1] filed a Motion for Leave to File Response [Doc. # 69], attaching a proposed response ("DHHS Response"). The Debtor filed a Response to DHHS's Motion for Leave to Respond, prompting DHHS to file a further Reply ("DHHS Reply") on November 6, 2015. DHHS then amended its Motion for Leave to Respond on November 20, 2015 [Doc. # 78] (the "Amended Motion to Respond"), detailing the results of an investigation concerning the state-wide computer system used by DHHS.

The pleadings and testimony presented at the Hearing established the following facts. The Debtor commenced her bankruptcy case by filing a Chapter 13 petition on April 19, 2012 (the "Petition"). At the time of filing the Petition, the Debtor was performing under an agreement with Harnett County to repay past economic assistance paid to her for which she was not legally entitled. The Debtor and Harnett County reached an agreement whereby she would repay $19,616.00 that she had received from 2006 through 2011 by making monthly payments in the amount of $50.00. If the Debtor failed to make the agreed upon payment of $50.00, Harnett County would garnish her monthly Social Security benefits. The Debtor, in filing her Petition, did not list Harnett County or DHHS as a creditor, did not list the $50.00 of payments to Harnett as an expense on her schedule J, and did not serve Harnett County or DHHS with notice of bankruptcy. Thus, Harnett County and DHHS did not receive formal notice of the Petition at the time of filing.

---

[1] Local Bankruptcy Rule 9013-1(e) provides, "[a]ny party against whom relief is sought may file a written response to the motion . . . . A response and accompanying affidavits, if any, to a motion shall be served within the earlier of 14 days from the date of service of the motion, or 3 business days from the date of the hearing on the motion, unless otherwise ordered or provided in the Federal Rules of Bankruptcy Procedure or these Local Rules."

On February 1, 2013, the Debtor became aware that her Social Security benefits had been garnished in the amount of $252.90.  Id.  Having been in bankruptcy for almost a year, the Debtor contacted Harnett County in person on February 18, 2013, and informed the County that she had filed bankruptcy.  Debtor then informed her attorney that her wages were being garnished and that, due to the reduction in wages caused by the garnishment, she could no longer afford to make the payments on her home.  Debtor's counsel filed a motion on February 27, 2013, to surrender the Debtor's home [Doc. # 23].  The motion cites unforeseen loss of income caused by no longer receiving food stamps and garnishments on her retirement income by Harnett County.  At the hearing on the motion on March 29, 2013, the Court stated that the garnishment appeared to constitute a violation of the automatic stay and asked the Debtor's attorney to investigate and take any steps necessary to cease any further post-petition garnishments.

In response to the Court's admonitions, on April 16, 2013, Debtor's attorney wrote a letter to Harnett County Department of Social Services, informing it of the stay violations caused by the garnishment and asking Harnett County to explain the post-petition garnishments.  [Doc. #53-1].  Harnett County did not respond to the notice of the stay violation until two weeks later, by sending a letter from county attorney Penny K. Bell to Debtor's counsel on April 30, 2013.  In this letter, the county stated that it had not been informed of the bankruptcy until February 18, 2013, and explained the pre-petition basis for the garnishment.  Ms. Bell explained that the garnishments were a result of the Debtor's agreement to repay Harnett County but that the "garnishment ha[d] been removed and the matter ha[d] been placed on hold pending further instruction," due to the Debtor's attorney's inquiry.  [Doc. # 53-2].

3

The letter sent by Harnett County on April 30, 2013, also acknowledged that, despite knowing of the bankruptcy on February 18, 2013, the garnishment was not actually removed until after the Debtor's attorney sent his letter in April. In the interim, on March 4, 2013, and April 1, 2013, respectively, the Debtor remitted two additional direct payments in the amount of $50.00 each to Harnett County consistent with the terms of the pre-petition repayment agreement. Harnett County accepted these payments even though there is no dispute that it had knowledge of the bankruptcy and the automatic stay at that time. Had those payments not been made, it is possible the Debtor would have continued to experience garnishments during those months.[2]

Despite the County's knowledge of the bankruptcy, and despite its statement that the problem had been solved, the improper garnishments resumed in July of 2015. [Doc. # 62]. The Debtor's Social Security benefits were garnished in the amount of $203.13 in July of 2015, and $278.38 on August 1, 2015.

According to the Debtor's testimony, the Debtor contacted DHHS and spoke to a representative named Kiki Turner, who reportedly looked into the Debtor's case and informed her that the renewed garnishments were in error. Ms. Turner was not present at the Hearing. Daphne Tyler, program administrator for Harnett County, testified that the Debtor contacted Harnett County directly on August 4, 2015, by phone and spoke with Tyler. The Debtor informed Tyler of the garnishments and her resulting extreme hardship, including checks to her supplemental health insurance provider and landlord that were returned to her due to insufficient funds in her bank account, resulting in the loss of supplemental insurance and being subjected to

---

[2] Harnett County and DHHS further violated the automatic stay by accepting the $50 post-petition payments from the Debtor; the Debtor did not move for sanctions with respect to either the initial garnishments in the case or the county's acceptance of the post-petition payments, but instead assumed the issue had been resolved through contact by the Debtor's attorney.

a summary eviction action.  That day, Tyler asked the case investigator to pull and review anything involving bankruptcy in the Debtor's file.  On the same day, the case investigator informed Tyler that there were no bankruptcy papers in Debtor's file, and nothing in the file at all to indicate the Debtor was in bankruptcy.

Tyler also testified that she alerted DHHS by fax to stop garnishments on the Debtor's account due to her bankruptcy filing.  Tyler acknowledged that DHHS should have been alerted to the Debtor's bankruptcy as of 2013, and there should have been an indication on her to stop the garnishment due to the bankruptcy.

Tyler provided testimony concerning EPICS, the computer system through which the county and DHHS manage support payments and garnishments.  According to Tyler, the county inputs any re-payment agreement into the EPICS system.  After this input, garnishment of the client's benefits will happen automatically if any payment under the plan is missed.  Tyler testified that when she inputs a payment agreement into the system, she knows that a garnishment will occur automatically if the County does not record a timely payment under the plan on the system.  Tyler testified, when payment occurs, an investigator or clerk "goes into the EPICS system, keys in the amount of the payment, the date of receipt," and the payment shows up in the system.  But when there is no payment, a no payment receipt automatically initiates EPICS to garnish funds from the Debtor's Social Security benefits and the funds are directed to DHHS.  Tyler testified that EPICS is a state system, and that, although the County's inputs will trigger an automatic garnishment if there is a default, the actual garnishments are effectuated at the state level.  She testified that she knew a garnishment would start automatically if the investigator clerk did not key in a timely payment.

On August 12, 2015, both Tyler and a program integrity investigator, Cynthia Collier, wrote and signed a letter to the Debtor, following up on their conversations about the latest garnishments. In the letter, the County conceded that the garnishments were made in error—not because of the automatic stay, but because the Debtor's obligation to repay had been "waived some time ago." [Doc. # 52-3]. The letter further informed the Debtor that the County had contacted the state office of DHHS on August 5, 2015, to request continued blocking of the collection action against the Debtor and to request monies that had been garnished be returned "as soon as possible." Id. The County further stated that it had repeatedly contacted DHHS frequently to check on the Debtor's status, but that DHHS stated it had not yet received the Debtor's funds, and that it could take "several months to verity [sic] that the funds have been received . . . ." Id. Apparently unconcerned about the continued exercise of control over the Debtor's post-petition income and the effects that deprivation might cause to an individual with such limited means, the County stated that it had no idea how or when any refund might occur. There was no garnishment in September.

Harnett County did not offer any evidence, other than testimony, of direct communication between the DHHS and Harnett County concerning garnishments.

The Debtor established that she suffered damages as a result of the garnishments and the continued deprivation of her income. She testified that she already was on an extremely tight budget of $1,095.00 per month after deductions from pension, and the garnishments took approximately a fifth to a quarter of her monthly income. Additionally, the Debtor currently is the only caretaker of four dependents: a sixteen year old daughter, a grandson age 8, a granddaughter age 6, and a granddaughter age 4. Debtor's non-filing spouse resides in a nursing and rehabilitation center.

6

The Debtor testified that the garnishments left her checking account totally empty and resulted in a cascade of consequences and damages.  When her rent check was returned for insufficient funds, her landlord commenced summary eviction proceedings against her, and the Debtor was required to go to court to attempt to remain in her residence.  As a result of bank overdraft fees, the check she had written to pay her electric bill similarly was dishonored and she was removed from the utility's equal payment plan.  Her hospitalization and supplemental medical insurance coverage from Equitable Life was cancelled because she missed two insurance payments due to returned checks caused by the garnishments. Her home renter's insurance was cancelled for the same reason.  The Debtor also was justifiably distraught that the garnishments would continue into future months and neither Harnett County nor DHHS could tell her when the garnishments would cease and when she would be reimbursed for the money already improperly garnished.  Letters to the Debtor conveyed that the process could take "several months," and were non-committal and blasé about the deprivation of the Debtor's meager income.  [Doc. # 53-3].  The Debtor also testified to the emotional and physical toll that the stress caused, including a rise in blood pressure that sent her to the doctor, poor sleep due to stress, and fear of being thrown out onto the street with her young dependents because of an inability to pay full rent.

Although the bank charged her fees for the checks that were returned for insufficient funds, the Debtor was able to get the bank to refund the charges after explaining the situation. The Debtor was able to further mitigate some of her damages by attending the summary eviction proceedings, where the judge allowed her to remain in her apartment after considering the reason for her dishonored check.  The Debtor was not able to mitigate all her damages, however.  The Debtor has significant health issues, the care for which is not covered by Medicare or Medicaid. She was able to obtain this care through private supplemental insurance.  She previously paid

$139.00 each month for this supplemental insurance. Due to the returned checks caused by the garnishment and the continued exercise of control over the improperly garnished funds, the supplemental insurance was cancelled because of the default and her inability to immediately pay a total of $415.79 to reinstate the plan caused by the delay in returning her wrongfully garnished funds. After receiving the returned garnished funds, she was unable to obtain the same insurance due to pre-existing conditions. In attempting to obtain similar replacement insurance, the Debtor testified that the least expensive similar policy she can find now will cost $400-$500 per month. Her past due electric bill is now well over $500 due to the loss of her ability to participate in the equal payment plan.

As of the date of the hearing, the Debtor testified she had received three checks from DHHS in repayment of the garnishments. She testified to being owed still one check, and there was no evidence from Harnett County to dispute the continued failure to turnover these wrongfully held funds.[3]

The Debtor moved for sanctions against both Harnett County and the State of North Carolina DHHS. In its Response, Harnett County does not dispute that both garnishments occurred and does not deny the garnishments were an attempt to collect a pre-petition debt. Harnett County argues that the garnishments were a mistake, initiated solely at the state level and not by Harnett County. Therefore, Harnett County believes it is not responsible for any of the garnishments. The county argues that the garnishments were "not made by Harnett County; were without the knowledge of Harnett County; and were beyond the control of Harnett County." [Doc. # 62]. Harnett County also alleges it took immediate, affirmative steps to ameliorate the situation "in order to minimize any inconveniences to the Debtor." Id.

---

[3] DHHS asserts in its untimely Proposed Response that all amounts now have been repaid.

Harnett County argues two bases upon which it should not be liable for a violation: (1) the acts triggering the garnishments were not willful, and (2) Harnett County had no control over the garnishment system, which is controlled at the state level by DHHS.

In her testimony, Daphne Tyler stated that in her conversation with a representative from DHHS concerning the garnishment, DHHS conceded that a mistake had been made at their level. In its untimely filed Proposed Response with an attached affidavit from Betsy E. Moore, DHHS details the garnishment as being a product of "troubleshooting that the DHHS Information Technology Division ("DHHS IT") was performing on DHHS's computer systems . . . ." [Doc. # 69-2, ¶ g].   DHHS stated in its Amended Motion to File Response that the cause of the garnishment was a compounding computer error that was not corrected for approximately four months.  [Doc. # 73].  DHHS states this DHHS IT mistake caused the bankruptcy litigation code to be removed inadvertently from Debtor's EPICS record. Id.  This inadvertent removal, DHHS claims, caused the Debtor's overpayment claim to be "automatically submitted to the Treasury Offset Program, which initiated garnishment of Debtor's Social Security benefits." [Doc. # 69-2, ¶ e].

## DISCUSSION

### A.      The Motion for Leave to File a Response

In order for the Court to allow DHHS's Proposed Response and grant the Motion for Leave to File a Response, DHHS must show that DHHS's failure to file a response by the deadline was due to excusable neglect.  Fed. R. Bankr. Pro. Rule 9006; In re Brown, 223 B.R. 82 (Bankr. M.D.N.C. 1997).  Factors considered when determining whether neglect is excusable include: (1) the danger of prejudice to the debtor; (2) the length of delay and its potential impact

on bankruptcy proceedings; (3) the reason for delay, including whether it was within reasonable control of the creditor; and (4) whether the creditor acted in good faith. Id. at 84.

Eight days after the Court heard arguments on the Debtor's Motion for Sanctions, and approximately a month and nine days after DHHS was served with the Motion for Sanctions and Notice of Hearing, DHHS filed a motion asking the Court to accept its untimely Response to the Motion for Sanctions. [Doc. # 69]. In DHHS's Proposed Response, DHHS admits to having timely received service of the Motion for Sanctions on or about September 21, 2015. Id., ¶ 6. DHHS alleges, however, that because it was not served with Harnett County's Response to the Motion for Sanctions, it did not have an opportunity to respond to the allegations contained in the County's Response regarding DHHS's responsibility in the alleged violations. Id., ¶ 17.

DHHS did not need Harnett County's Response to the Motion for Sanctions in order to be alerted that the Debtor sought relief directly against DHHS. The Motion for Sanctions clearly asserts that both DHHS and Harnett County are liable for the violations of the automatic stay. DHHS has not cited any authority to support the proposition that a properly served respondent is not required to respond to a motion unless a co-respondent properly serves its response upon all parties to the contested matter. Such a rule would be ill advised, and, in any event, DHHS should have been aware that Harnett County was attempting to place the blame on DHHS. As noted by DHHS in its motion for the Court to consider its late filed response, the Debtor states in its original motion that "Harnett County is transferring its culpability to the North Carolina Department of Health and Human Services." [Doc. # 53, ¶ 6 and Exhibit C]. The letter from Harnett County to the Debtor that is attached to the Debtor's Motion for Sanctions contains repeated references to the state program and state responsibility for the garnishments or any repayment. Debtor listed the alleged violations, described Harnett County's conduct surrounding

the garnishments, and stated that DHHS was accountable for the garnishment as the alleged error causing them to resume came from DHHS.

DHHS's rationale for its lack of response is illogical and inexcusable.  Ignoring the original motion which clearly seeks relief against DHHS, and then filing a response only after waiting to see whether or not Harnett County might take full responsibility for the alleged violation, or whether the county might continue by response to insist the error was caused at the state level, does not demonstrate either good faith or the level of diligence required for excusable neglect when DHHS was properly served with a motion that clearly sought relief against it.

Daphne Tyler testified at the Hearing that a DHHS representative informed her that the alleged error causing a violation occurred at the state level.  DHHS excuse implicitly concedes that its failure to respond was a conscious decision despite the clear request for relief pending against it. In contrast, having properly served the motion and relying upon the notice and scheduling of the Court, the Debtor took time away from caring for her four dependents, incurring expenses for traveling to court, in order to be present and testify at the October 22, 2015, Hearing. [Doc. # 70, ¶ 20].  DHHS could have been present to cross examine any witnesses and state its position at the Hearing, and it could have filed any objections prior to the Hearing.[4]  By choosing not to appear at the Hearing, and belatedly seeking further consideration of proposed evidence that could have been adduced at the original hearing, DHHS would cause the Debtor to incur further expense in attending additional hearings or responding to the factual and legal issues raised by

---

[4] DHHS asserts that it is unable to find in its records a copy of the Certificate of Notice [Doc. # 57] or the Notice of Hearing [Doc. # 56] related to the Debtor's original Motion for Sanctions.  (Thompson Affidavit ¶ 4.b.). Nevertheless, as conceded in the Thompson Affidavit, the Certificate of Notice filed by the Bankruptcy Noticing Center avers that the Notice of Hearing was properly mailed to DHHS at its proper service address.  Id.  When an item is properly mailed, a presumption of receipt arises which is rebuttable only by clear and convincing evidence. In re Burton-Alston, 2006 W.L. 12904, *2 (Bankr. M.D.N.C. January 3, 2006).  Mere denial of receipt is insufficient to rebut this presumption.  Id.  In this case, DHHS does not even deny receipt.  Instead, it merely asserts that it is unable to locate it in its records.  This is an insufficient showing to rebut the presumption of receipt.  Moreover, even if DHHS had not received the Notice of Hearing, it concedes that it was served with the underlying motion seeking relief against it in this Court.

DHHS.  This delay and further expense is prejudicial to the Debtor, given her precarious financial situation and sole custody of four minor dependents.  Therefore, the DHHS's Response is untimely under Rule 9006(b)(1) and Local Rule 9013-1, and the Court will DENY the Motion for Leave to Respond.  As such, the Court will not consider the untimely response.

On November 20, 2015, DHHS filed an Amended Motion for Leave to File Response [Doc. # 78] (the "Amended Motion to File Response").  Through the Amended Motion to File Response, DHHS purports to solidify the bases and timeline for the errors that occurred which initiated the garnishments on Debtor's Social Security benefits.  For the same reasons set forth above, the Court will DENY the Amended Motion to File Response, but the Court nevertheless notes that the timeline presented by DHHS does not contradict the Debtor's timeline or the timeline presented by Harnett County in testimony and through timely filed motions and responses.  DHHS expands upon and details the computer error that Harnett County said caused the garnishments, thus supporting and not contradicting Harnett County's testimony as to how the garnishment occurred.

## B.  Automatic Stay

The filing of a petition under 11 U.S.C. § 301 "operates as a stay, applicable to all entities, of . . .  any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . . ."  11 U.S.C. § 362(a)(6).  The automatic stay is one of the most fundamental and important protections given to debtors under the Bankruptcy Code.  See In re Barrow, Case No. 14-06570-5-SWH, 2015 W.L. 1545684, *3 (Bankr. E.D.N.C. March 15, 2015).  An individual injured by a willful violation of the stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1).  The debtor bears the burden of establishing by

preponderance of the evidence that a willful violation has caused injury.  Clayton v. King (In re Clayton), 235 B.R. 801, 806 (Bankr. M.D.N.C. 1998).

The Bankruptcy Code establishes the automatic stay not only as a fundamental protection to a debtor filing a petition, but also to creditors seeking a just and successful distribution.  Baum v. United Virginia Bank (In re Baum), 15 B.R. 538, 541 (Bankr. E.D. Va. 1981) (setting out a fundamental guide for any creditor to take who has instituted garnishment proceedings against a debtor in bankruptcy in order to respect the automatic stay and allow for "an orderly and equitable distribution of the estate of the debtor").  The stay provides the debtor breathing room necessary to operate and function without harassment or fear of losing property while organizing and implementing a plan for repayment of an overwhelming amount of debt.  Weatherford v. Timmark, Carey Holdings Inc., et al. (In re Weatherford), 413 B.R. 273, 283 (Bankr. D. S.C. 2009) (finding a creditor's willful violation of the automatic stay caused the debtor anxiety and depression after she was forced to make payments on a void judgment, lose interest on over $14,000, and lose time spent initiating and pursuing an action for sanctions against the creditor).

There is no question that the automatic stay was actually violated in 2015 when the Debtor's Social Security benefits were garnished after both Harnett County and DHHS were informed of Debtor's bankruptcy.  The evidence presented at the Hearing also establishes that the stay violation caused significant injury to the Debtor, which injury was compounded by the subsequent delay in refunding improperly garnished funds.  DHHS and Harnett County contend that this violation of the stay was not willful as contemplated by 11 U.S.C. § 362(k)(1).  The Court disagrees.

Willful violation of the automatic stay occurs when a creditor has knowledge of the bankruptcy case and takes an intentional action.

13

> To establish a willful stay violation, it must be shown that the party knew of the bankruptcy filing and then took some action. It does not matter whether the party had specific intent to violate the stay or acted in good faith based upon a mistake of law or legal dispute regarding its rights. In re Sharon at 687–688; In re Ramirez, 183 B.R. 583, 589 (9th Cir. BAP 1995); In re Bloom, 875 F.2d 224, 226 (9th Cir.1989). When reasonable, actual notice is received, it becomes a creditor's responsibility to ensure it has not violated the stay, or if it has been before receipt of actual notice, to reverse any action taken through direct and affirmative measures. In re Smith, 180 B.R. 311, 319–321 (Bankr. N.D. Ga.1995); In re Sams, 106 B.R. 485, 490–491 (S.D. Ohio.1989).

In re Johnson, 253 B.R. 857, 861 (Bankr. S.D. Ohio 2000) (prepetition wage garnishment that continued after the creditor was informed of debtors' bankruptcy case was a violation of the automatic stay even though creditor took no actual further action).  The creditor does not need formal notice of the existence of the bankruptcy to have knowledge of the case; communication from the debtor or the debtor's counsel is sufficient to impart knowledge.  In re Clayton, 235 at 807 ("a creditor may be charged with notice of the bankruptcy if it were in possession of sufficient facts to cause a reasonably prudent person to make further inquiry").  The creditor does not have to act with specific intent to violate the stay in order for a court to find a willful violation, but creditors are not strictly liable for any violation.  Id.  Willfulness describes the intentional nature of the action taken by the creditor that violates the stay but not necessarily the creditor's specific intent to act in violation of the stay.

Harnett County concedes that it input the pre-petition payment agreement and that it knew that, once it had done so, any missed payment automatically would trigger a garnishment at the state level.  Nevertheless, it argues that the violation was not willful because the garnishment occurred at the state level.  On the contrary, a creditor violates the stay willfully when it has knowledge of the bankruptcy and it fails to take possible and necessary action to prevent the continuation of the collection process; in such an instance, inaction amounts to reckless disregard and a violation of the automatic stay.  Johnson, 253 B.R. at 861 (creditor who

14

hired attorney to collect debt owed by the debtor denied having knowledge of the continued collection activity post-petition but was still liable for a willful violation of the automatic stay because he failed to take necessary positive action to stop his own agent in the collection process); Scroggin v. Scroggin (In re Scroggin), 364 B.R. 772, 781 (B.A.P. 10th Cir. 2007) (whatever small action the creditor took to suspend garnishment upon learning of the debtor's bankruptcy was insufficient to actually halt the garnishment and thus creditor could be sanctioned for the reckless disregard of the Debtor's federal rights). Once a creditor initiates the process to collect a debt from a debtor, the creditor must affirmatively act to stop "the downhill snowballing" of a continuing garnishment in order to avoid a violation of the automatic stay. See Gordon Properties, LLC, v. First Owners Ass. Of Forty Six Hundred (In re Gordon Properties, LLC), 460 B.R. 681, 694 (Bankr. E.D. Va. 2011); Elder v. City of Thomasville (In re Elder), 12 B.R. 491, 494 (Bankr. M.D. Ga. 1981).

In Elder, the debtor sought an injunction against a creditor, alleging that garnishments initiated by the creditor violated the automatic stay. In re Elder, 12 B.R. at 494. The creditor had obtained default judgment against the debtor and proceedings were filed against the debtor's employer. After the debtor filed bankruptcy under chapter 7, usual notice was mailed to the creditor from the court, and the attorney for the debtor notified the creditor's attorney of the bankruptcy shortly thereafter. Debtor's employer also was notified of the debtor's bankruptcy by the debtor's attorney, but because the debtor did not list his employer on his schedules, no notice of the bankruptcy was sent by the court to the debtor's employer. The garnishment did not halt. As a result, the debtor filed a complaint against both the employer and the creditor. At the hearing on the matter, the court determined that once the debtor adequately notified all parties involved of the bankruptcy, the automatic stay was intended to be self-operating and required all

notified parties to prevent any violation.  The creditor was obligated to stop the snowball effect with the expectation that the creditor would dismiss the garnishment or at least stay the garnishment by advising state court personnel and the employer that until further notice the garnishments should stop.  Id.  The court held that positive action was required by the creditor as the garnishment had already been set in motion by the same creditor.  The court found that both the creditor and the debtor's employer were liable for the violation of the stay and were responsible for paying the debtor's attorney's fees.  Id. at 496.

As recognized in Elder, when a creditor sets the garnishment in motion, it is responsible for what happens thereafter.  See id. at 494.  Regardless of how easy or difficult it is to stop the garnishment, the creditor must take the necessary steps to effectively cease the garnishment. Simply alerting the third party who actually garnishes the debtor's Social Security benefits to stop the process is not enough if the process requires more than a notification.  In re Scroggin, 364 B.R. at 781 (quoting the bankruptcy court, "[i]t's not good enough to file [the release of garnishment] and step back and say we can't do anything else, because you know what? You can do something else").

Once the garnishment began and Harnett County had notice of the bankruptcy filing, it was obligated to take whatever steps were necessary in order to halt or dismiss the garnishment – on its end and in its dealing with DHHS.  Reliance on a broken chain of communication or an improperly functioning computer system is no excuse for the hardships imposed on the Debtor and her four dependents, even if Harnett County sees these garnishments as mere "inconveniences."  For a woman and her family living paycheck to paycheck, those two

garnishments were the difference between sufficient medical insurance, utilities, a roof over their heads, and the completion of a chapter 13 bankruptcy plan.[5]

Harnett County also argues that it was a computer error on DHHS's end that triggered the garnishments, and, therefore, the violation was mere "innocent clerical error" and not willful. Harnett County did not offer evidence of any specific computer error that caused the post-petition garnishments. Moreover, the insufficiencies in this case are not limited to mere computer error. Harnett County's own testimony established that, more than two years after being notified of the Debtor's bankruptcy, there was no indication whatsoever in the Debtor's file of a bankruptcy filing. The absence of any indication of the bankruptcy demonstrates that the county and DHHS did not have a sufficient process in place to protect against violations of the automatic stay. In any event, even if the violations here were solely attributable to computer error, this district has been reluctant to allow "computer problems" to be an excuse for the inaction that follows any systematic error. See In re Drake, 2015 WL 393408, * 3 (Bankr. M.D.N.C. 2015). In Drake, a credit union, Truliant, relied on a coding system to prevent transmission of billing notices to debtors. An internal computer glitch occurred after the credit union transitioned all of its accounts and records into a new computer system. As a result, the code corresponding to the debtors' account did not transfer, and the billing notices continued to be sent to the debtors even after the trustee had made its final payment to the credit union. The court indicated that one billing notice might have been innocent, but upon receipt of notice that Truliant was in violation of the automatic stay, the second billing notice should not have occurred. The court rejected the argument that Truliant's violation could not be willful because it was merely a product of a computer glitch and stated:

---

[5] Having lost her residence and unable to complete her plan payments, the Debtor has filed a motion for a hardship discharge under 11 U.S.C. 1328(b). [Doc. # 54].

> Truliant created and continues to utilize its computer system to, among other things, efficiently send billing notices to its customers. The purpose of sending billing notices is for Truliant to collect payments from its customers. Truliant determined to collect money from its customers through the billing notices sent by its computer system. While the first billing notice may not have been intentionally sent, the second billing notice was intentionally sent because of the Trustee's letter. The Trustee's letter sufficiently put Truliant on notice that it violated the automatic stay by sending the first billing notice . . . The second billing notice was sent to intentionally collect a debt from someone that Truliant actually knew to be in bankruptcy and therefore was a willful violation of the automatic stay.

As in Drake, the method of using a computer system to collect payments due under the overpayment agreements in this case, requires Harnett County and the DHHS to be responsible for the violations when insufficient action is taken to halt the garnishment.

Government entities are not held to a different standard. The Western District of North Carolina in Shealy similarly found that the South Carolina Tax Commission willfully violated the automatic stay even though the violations were caused by "clerical error" because the violations resulted from the Commission's disregard of action necessary to respect the automatic stay. In re Shealy, 90 B.R. 176, 179 (Bankr. W.D.N.C. 1988). The court held that the South Carolina Tax Commission was willfully violating the automatic stay when it sent notices to the debtors. Id. at 178. According to the Commission, the violations were caused by clerical error when an employee failed to see the bankruptcy claim filed in the debtors' file, and as a result, demand notices were sent to the debtors. The court noted the Commission's failure to remedy the error, even after numerous notices that the debtor had filed for bankruptcy, and failure to sufficiently communicate about its corrective measures with the debtors. In distinguishing reckless disregard from innocent clerical error, the court noted that the Commission received numerous notices of the debtors' bankruptcy, it had taken no action to remedy the violations until the debtors threatened sanctions, and the Commission failed to communicate with the debtors as

to how and when the problem of the violation would be remedied.  Id. at 180.  Though the court heard testimony and acknowledged that the Commission handled millions of tax returns each year and dealt with thousands of bankruptcy petitions, the court found that it was appropriate to impose sanctions.

In two cases from the Western District of North Carolina, the district court and bankruptcy court have distinguished Shealy, finding no willful violation of the stay where the violations were caused by innocent clerical error that caused no injury to the debtor and were quickly and easily halted and remedied. See Hamrick v. Defense Finance & Accounting Service (In re Hamrick), 175 B.R. 890 (W.D.N.C. 2009); In re Peterson, 297 B.R. 467, 470 (Bankr. W.D.N.C. 2003).   Hamrick and Peterson have been criticized to the extent that they are interpreted as excusing any violations of the stay resulting from human clerical or computer error, and/or to the extent that the courts hold that willfulness as contemplated by 11 U.S.C. § 362(k) requires specific intent to violate the stay.  See e.g., In re Nixon, 419 B.R. 281, 289 (Bankr. E.D. Pa. 2009) (and cases cited therein).  In Nixon the court compiles and analyzes cases concerning intentional creditor action following human clerical or computer error, and concludes the majority of courts have found such action to be a "willful" violation of the stay.  Id. at 289.  The court adopted the majority of decisions because the decisions were "more consistent with binding appellate precedent," that "willfulness" goes to the intentional nature of the action taken by the creditor that violates the stay and not the specific awareness that the action violates the stay.  Id.  This standard similarly is consistent with other precedent from this circuit.  See In re Lofton, 385 B.R. 133, 140 (Bankr. E.D.N.C. 2008) ("willfulness does not refer to the intent to violate the automatic stay, but the intent to commit the act which violates the automatic stay").  The court in Nixon determined that the "error" that triggered the creditor's conduct simply

established that the creditor was unaware of the debt collection but did not establish that the creditor's collection action was not willful.  Id.  In any event, both Hamrick and Peterson are distinguishable from the present case, and should not be interpreted so broadly.

In Hamrick, the creditor relied on a system by which a computer program would send automatic demand notices to debtors who were in payment default unless a computer code was placed on the debtors' account signifying that a particular debtor was in bankruptcy. In re Hamrick, 175 B.R. at 891.  The creditor sent one or more demands for payment to the debtor immediately after the bankruptcy case had been filed and the creditor had been given proper notice.  The debtors issued a written warning to the creditor, and the creditor withdrew the demand notices, giving the debtors an apology.  One year after the first incident, the creditor sent one more demand letter to the debtors.  Due to "failure to correctly train" an employee, the employee overrode the computer code on the particular debtor, allowing the automatic demand to be sent.  The court recognized that a mechanism was in fact in place to prevent the generation of demand notices which would have prevented the notice but for the "innocent" mistake of a new employee.  As a result, the debtors received a demand notice post-petition.  The court observed that it was significant that there was no harm to the debtors in simply receiving this notice; the record contained no evidence of any injury, or that the debtors "were in any manner . . . even bothered by this demand notice." Id. at 893.  Additionally, the court viewed the employee's error as an isolated incident. The court rejected a finding of willful violation in this case because doing so "would be to impose a form of strict liability on creditors, which in today's computer-controlled financial world, would amount to nothing less than a windfall for

debtors' attorneys where no true injury results." Id. at 893.[6]  Thus, the court's decision turned on

the lack of injury to the debtor and the fact that the violation was an isolated incident.

Similarly, in Peterson, the court clearly and primarily was concerned with debtor's

counsel's overreaching and vexatious conduct.  Prior to the debtor's bankruptcy, the debtor was

paying the creditor through automatic draft on her checking account.  In re Peterson, 297 B.R. at

469.  After the debtor entered bankruptcy, the payment to the creditor was made through the

trustee on the secured portion of the creditor's claim.  The creditor sent a letter to the debtor

threatening repossession of collateral.  When debtor's counsel informed the creditor that the

notice was in violation of the stay, the creditor sent a notice about one week later to the debtor

advising that the letter was sent in error and apologizing.  Ten months later, the creditor caused

the debtor's checking account to be debited for payment on its loan.  The debtor borrowed

$300.00 from family and straightened out the account about a week later.  The debtor also

notified her attorney of the debit.  Instead of attempting to remedy the problem or to contact the

creditor, within five days of receiving the notice, counsel filed a motion for sanctions requesting

more than $15,000.00 in damages and asserting putative claims for violations of the Fair Debt

Collection Practices Act, 15 U.S.C. § 1692(a)(2), the "North Carolina Deceptive Practices Law,"

N.C. Gen. Stat. §§ 75-55(3) and 58-70-115(3).  Id. at 469-70.  The court found that only error

resulting from mistake or inadvertence could have caused the automatic debit.  The court

---

[6] Even if the Court had considered the Motion for Leave to Respond or the Amended Motion for Leave to Respond, the defective computer program that DHHS asserts resulted in bankruptcy safeguards being over-ridden indicates that DHHS did not have sufficient mechanisms in place to prevent improper garnishments in violation of the automatic stay.  In both Peterson and Hamrick, the courts specifically noted that the creditors had sufficient mechanisms in place to prevent violations of the automatic stay.  Peterson, 297 B.R. 471 (creditor "had in effect procedures designed to ensure compliance with the bankruptcy stay"); Hamrick, 175 B.R. at 893 (creditor "had in place a mechanism to prevent" the violation).  Garnishment of struggling debtors' incomes can have drastic and compounding consequences, as it did in this case.  Creditors who choose to employ garnishment as a process to enforce collection, must be vigilant to ensure that an adequate system is in place to stop the garnishments when a bankruptcy is commenced—especially after the history of repeated improper post-petition garnishments and acceptance of unauthorized post-petition payments in this case.

observed that counsel for the debtor undertook a "vexatious" motion "without foundation" without even attempting to contact the creditor when the debtor had not suffered any real harm by the violation.  Id. at 473.  The court stated,

> There appears to be no real injury to the debtor by Chevy Chase Bank's actions. There was some measure of shock, disturbance, and annoyance, but nothing that would amount to an injury meriting damages.  The actual monetary cost to the debtor was minimal and was quickly remedied.

Id. at 472.   The court noted there was no other evidence of any action by the creditor demonstrating a willful violation: though there was a previous violation of the automatic stay in Peterson, the two violations were unrelated, isolated events and did not indicate a pattern of repeated collection efforts; there was no indicia of indifference to the stay; there was no aggravated conduct by the creditor; and there was no flagrant or persistent refusal to cease action after being advised of the bankruptcy proceeding.  Id. at 471.

Here, by contrast, there is real, actual, significant, and compounding harm to the Debtor which occurred as a result of repeated violations of the stay.  The record contains no indication that counsel's motive is vexatious as the court found in Peterson.  The Debtor was subjected to summary ejectment proceedings, her supplemental insurance was cancelled, she lost the ability to participate in a utilities repayment program, and she suffered emotional distress.   The garnishments in this case also cannot be viewed in a vacuum.  See In re Shealy, 90 B.R. at 179. This Debtor had two previous post-petition garnishments.  Once Harnett County was notified of the bankruptcy filing after these initial garnishments, the county knowingly accepted two payments from the Debtor on the pre-petition debt, failed to prevent two more garnishments, and failed to immediately return the funds improperly garnished.  Compounding the length of time were the Harnett County's statements to the Debtor that the time within which her funds would be returned and the garnishment resolved was indefinite, and that no time table for return of her

income could possibly be known because the methods for returning the Debtor's money were uncertain. The complete silence on the part of DHHS except through Harnett County further demonstrates a lack of responsive action.

EPICS was built to manage payments and collections, including processing garnishments. The computer action that triggers a garnishment from the debtor is an intentional act to collect money from the Debtor. It is the responsibility of the user of any computer program to ensure it is functioning properly. See, e.g., Rijos v. Vizcaya & Citibank, (In re Rijos), 263 B.R. 382, 392–93 (B.A.P. 1st Cir. 2001) (creditor violated the automatic stay by sending two credit card statements even though the statements were issued accidentally by the computer while a new software was being installed); McCormack v. Federal Home Loan Mortgage Corp. (In re McCormack), 203 B.R. 521, 524 (Bankr. D.N.H. 1996) (stating, creditors "have a clear obligation to adjust their programming and procedures and their instructions to employees to handle complex matters correctly"). If Harnett County and DHHS rely solely upon entry of a bankruptcy code in a computer program to halt post-petition garnishments, both are responsible for ensuring the system at all times remains properly coded. See Lofton, 385 B.R. at 140 (the respondent commits a willful violation of the automatic stay when it "has no computer software or other procedure that would provide for a method of double-checking to ensure a computer entry was made upon receipt of a bankruptcy notice").

While Harnett County attempted to communicate with the Debtor, the Court is deeply concerned by the alleged errors in the EPICS system that allowed the Debtor's Social Security benefits to be garnished, even after a problem already had been detected. This situation is even more troubling given that the garnishments attempted to collect a debt that Harnett County states

in writing has been waived.  [Motion for Sanctions, Exhibit C (Doc. # 53-3)] ("This was a State action made in error, as your repayment of the claim was waived some time ago.").

## **CONCLUSION**

Willful violations of the automatic stay occurred when DHHS and Harnett County failed to halt the garnishments of Debtor's Social Security benefits in the amount of $203.13 in July, 2015, and $278.38 in August, 2015, and when they failed to immediately correct these garnishments.  For the reasons set forth herein, the Court will enter its Orders DENYING the Motion for Leave to Respond and Amended Motion to Respond, and enter its order: (1) finding that Harnett County and DHHS each committed willful violations of the automatic stay for which they are jointly and severally liable; (2) setting a further hearing to liquidate the amount of damages, including emotional damages, if any, caused to the Debtor by the violations set forth herein.

[END OF DOCUMENT]

## PARTIES IN INTEREST
### B-1280586 C-13D

Gail Newson Highsmith
1802 Savannas Run Drive
Greensboro, NC 27405

A.B. Harrington, III, Esq.
Post Office Box 1072
Sanford, NC 27331-1072

Richard M. Hutson, II
Standing Trustee
PO Box 3613
Durham, NC 27702

William P. Miller, Esq.
U.S. Bankruptcy Administrator
101 South Edgeworth Street
Greensboro, NC 27401

Harnett County Social Services
Attn: Managing Agent / Officer
311 Cornelius Harnett Blvd.
Lillington, NC 27546

Richard D. Sparkman, Esq.
Attorney for Harnett County
Department of Social Services  P O Box
1687
Angier, NC 27501

Penny K. Bell, Esq.
Attorney for Harnett County
Department of Social Services
P O Box 1686
Erwin, NC 28339

Department of the Treasury
Financial Management Services
Attn: Managing Agent / Officer
P O Box 1686
Birmingham, AL 35201-1686

Brian D. Rabinovitz, Esq.
Assistant Attorney General
NC Department of Justice
P O Box 629
Raleigh, NC 27602-0629

Emery E. Milliken
General Counsel, DHHS
101 Blair Drive
Adams Building
Raleigh, NC 27603